UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. CR416-154 |
| | ) | |
| TERIN MOSS | ) | |

## REPORT AND RECOMMENDATION

Terin Moss has been indicted for possession of a firearm, and possession of ammunition, by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Doc. 1. He moves to suppress the evidence against him (doc. 17), contending that police violated his Fourth Amendment rights by (1) unlocking and entering the car in which he slept, and (2) subsequently seizing his person by pulling him out of the car. *Id.* at 1.

I. BACKGROUND[1]

---

[1] The following facts come from video footage taken from body cameras worn by two police officers who investigated the incident that led to Moss' arrest. Because of the fatal issues discussed below, the Court cut short an evidentiary hearing without taking testimony (which would have come only from the police, since Moss conceded through counsel that he could not remember the events of October 8, 2015 and thus would not testify). Both parties, however, cite to the body cam videos (doc. 17-1 at 1; doc. 22), and Moss neither contests their authenticity nor argues that they furnish an inaccurate or incomplete picture of the events which they depict.

On October 8, 2015, Savannah-Chatham Metropolitan Police Officer Bibby responded to a call from an individual who stated that he had located a car he previously reported missing.[2] He informed the officer that two unknown males were sleeping in the car, which was parked on a public street, and offered him the car's keys. After conferring with another responding officer (no name known), Bibby concluded that he had sufficient information to inquire into the matter.

With Officer Graff now in tow, Bibby did just that. Bibby approached the driver's window, Graff the passenger's. They saw two men sleeping in the front seats. Bibby rapped on the driver's window in an effort to wake the occupants, to no avail.

At that point, Officer Graff obtained the car's keys from the man who originally called the police. Graff then unlocked the driver's side door, quickly removed another set of keys from the ignition, and

---

[2] The man, whose name is not identified in the record, apparently co-signed car loan documents with his girlfriend, though the car was not titled in his name. (The body cam video shows Bibby reviewing paperwork from Drive Time, a "buy here, pay here" car dealer, on the hood of his police cruiser after responding to the man's call.) He thus could not report it stolen; rather, he filed a missing person report regarding his girlfriend and included the car as a missing item.

proceeded to rub his knuckle down the sternum of the man sleeping in the driver's seat (Moss). Moss roused slightly, but remained groggy.

Graff then asked him if he knew "whose car this is," whether he had any identification (he didn't), and for his name. After a bit of back and forth, the still groggy Moss provided his name, at which point Graff checked the exterior of his front pants' pockets. A moment later Graff instructed "Terin [to] step out" of the car. Moss, still lying prone in the driver's seat, gave no response, so Graff repeated "Terin, step out."

Moss gradually began to respond, reaching out for the steering wheel to hoist himself to a sitting position. Once up, he slowly swung his legs out of the driver's compartment and onto the street. He remained only partially responsive and in somewhat of a daze. Graff asked him at that point "you alright?" Moss never responded.

He then told Graff (whose left hand at this point held the left sleeve of Moss' jacket) that he felt like he would pass out if he stood up, that he'd been drinking, and that he threw up earlier in the evening. Graff said "alright, well, stand up," as Moss remained half in the car still dazed. A few seconds later, after the female officer who originally accompanied Bibby stated "we got you, we ain't gonna let you fall," Moss

stood up with his right hand on the open car door and Graff on his left, though Graff was no longer gripping Moss' jacket.

As he rose, Graff asked him if he had any weapons. Perhaps two to three seconds later, as Moss fully stood up, he collapsed to the pavement. The female officer remained off-screen and was not touching or holding Moss when he fell. Graff, meanwhile, appears to have been attempting to search Moss' rear pants' pockets at the time he collapsed.

As Moss fell, Graff noticed a handgun lying in the driver's seat, underneath where Moss sat a moment before. Bibby, at Graff's direction, then handcuffed the passenger at the same time that Graff cuffed Moss, who remained on the ground. A subsequent search of Moss revealed a gun holster attached to his belt on his right hip.

Eventually emergency medical personnel arrived and examined Moss, who continued to exhibit behavior and body language suggesting some form of intoxication or other incapacitation. The EMTs found no need for emergent care but loaded Moss on a stretcher anyway as an apparent precautionary measure. Moss was later formally arrested and taken to the Chatham County Detention Center.

## II. ANALYSIS

Moss makes two claims: (1) "[w]hen [Officer Graff] unlocked the car, [Moss'] privacy rights were violated;" and (2) [w]hen [Graff] pulled Moss out of the car (still asleep), he had had been seized and his privacy rights violated again." Doc. 17-1 at 1-2. Two front-end issues -- his motion's timeliness and Moss' standing to assert a Fourth Amendment violation -- must be addressed before considering the merits of those claims.

### A. Timeliness

Under Fed. R. Crim. P. 12(c)(1), courts "may . . . set a deadline for the parties to make pretrial motions." "If a party does not meet the deadline for making a [pretrial] motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). That showing is "flexible [and thus] requires consideration of all interests in the particular case." Fed. R. Crim. P. 12(c) advisory committee's note to 2014 amendment.

This Court's Local Rule 12.1 provides a default deadline: "[u]nless otherwise ordered by the Court, all pretrial motions in criminal cases . . . shall be filed within ten (10) days of arraignment." The Scheduling

Order in this case, "[i]n accordance with the Court's instructions at [Moss'] arraignment," adhered to that timeline and warned him that "[u]ntimely motions or responses will not be considered absent a showing of good cause for failure to file within the time set by the Court." Doc. 8 at 1. That meant Moss' motion to suppress should have been filed no later than May 28, 2016. *Compare* doc. 7 (minute entry from May 18, 2016 arraignment), *with* doc. 8 (scheduling order).

Counsel -- without acknowledging or offering any reasons for its untimeliness, much less moving for leave to file out-of-time -- actually filed it seventeen days thereafter, on June 14, 2016. Doc. 17. At the recent hearing, counsel stated that the volume of discovery and duration of the body cam videos (3 to 4 hours according his account) explained and justified the untimeliness.

Large volumes of discovery can indeed constitute good cause for addressing a motion's merits despite its untimeliness. *See, e.g., Kearney Partners Fund, LLC ex rel. Lincoln Partners Fund, LLC v. United States*, 2012 WL 5906895 at * 2 (M.D. Fla. Nov. 26, 2012) ("In this instance, the volume of discovery, over 20,000 pages, and the length of time it took for the Defendant to produce the documents gives the Court good cause to

allow the Motion to Compel to be addressed on the merits even though it was technically untimely filed."). But nothing of the sort exists here. The Government represented -- and defense counsel did not contest -- that it produced a relatively small number of documents, and it estimated the video footage to last approximately 1.5 hours, not 3 to 4. In actuality, the videos total less than one hour.

Counsel had ample time to review the evidence and either file a timely motion or seek an extension. *See United States v. Knight*, CR401-068, doc. 94 at 3 (S.D. Ga. Aug. 7, 2001). He offers no good reason for failing to do so. Moss' motion to suppress (doc. 17) therefore should be **DENIED** as untimely.

B.  **Standing**

Even if untimeliness is excused, Moss has not shown that he had the requisite privacy interest in the vehicle which he occupied to contest the constitutionality of the police entry or search of that vehicle.[3]

---

[3] Proceeding to consider standing issues or a motion's merits does not "excuse the untimeliness of the motion." *United States v. Aguilar-Ibarra*, 740 F.3d 587, 591 (11th Cir. 2014) (citing *United States v. Milian–Rodriguez*, 828 F.2d 679, 683 (11th Cir. 1987) (district court's decision to deny a suppression motion both on timeliness grounds and on the merits did not excuse the untimeliness of the motion where the court "never indicated that it would excuse the waiver and decide the [ ] issue solely on the merits")).

> Fourth Amendment rights are personal rights which . . . may not be vicariously asserted. . . . A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's [vehicle] has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, *United States v. Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 619, 38 L.Ed.2d 561 (1974), it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (cite omitted).

To challenge a vehicle search under the Fourth Amendment, a defendant must show that he has a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980); *Rakas*, 439 U.S. at 143. "Determining whether an individual has [that] legitimate expectation . . . requires a two-part inquiry:" (1) whether the person manifested a subjective expectation of privacy in the property searched and (2) whether the expectation is one that society is prepared to recognize as legitimate. *United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988). "[A] legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy." *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (citing *Rakas*, 439 U.S. at 143-44 & n. 12). It is a "fact-specific" inquiry, *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir.

1998), that defendants bear the burden of satisfying. *Rakas*, 439 U.S. at 131 n. 1; *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984); 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.2(b) at 220-21 (5th ed. updated 2015).

Moss admits not owning the car.[4] He also offered nothing to show that he rightfully possessed the car. *Cf. United States v. Houston*, 589 F. App'x 507, 508 (11th Cir. 2015) (passenger of parked SUV "lacked standing to challenge the search of the vehicle" because another person claimed ownership, while registration showed two other individuals as owners); *United States v. Mosley*, 743 F.3d 1317, 1322 (10th Cir. 2014) ("[W]ithout a possessory or property interest in the vehicle searched, [occupants] lack standing to challenge vehicle searches.") (quotes omitted). When asked by the Court whether his client would testify that the vehicle owner entrusted him with the car, Moss' counsel demurred, stating that Moss could not remember the night in question or how he came to occupy the vehicle. Consequently, Moss has failed to satisfy his

---

[4] The body cam footage suggests -- and Moss does not dispute -- that the man who reported the car and girlfriend missing, and who had co-signed a note on that vehicle, appeared to the police to have some legitimate interest in the vehicle. Regardless of the accuracy of that belief, it is undisputed that the missing girlfriend, *not* Moss, is the vehicle's titled owner.

burden of establishing that he had any right even to be in the car, much less a legitimate expectation of privacy in the vehicle. *See Rakas*, 439 U.S. at 131 n. 1.

It follows that Officers Bibby and Graff violated none of *Moss'* Fourth Amendment rights when they unlocked the car in which he slept and ordered him out. Ignoring his motion's untimeliness and lack of merit (discussed below), that absence of standing alone dooms Moss' claim that his "privacy rights were violated . . . [w]hen [Graff] unlocked the car." Doc. 17 at 1.

### C. Merits

Untimeliness and standing issues aside, the entirety of the circumstances establishes that the officers committed no Fourth Amendment violation at all, much less one that aggrieved Moss. Police-citizen interactions come in three flavors: "(1) . . . exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)). Tier one triggers no Fourth Amendment safeguards. *Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056, 2063 (2016) ("Nothing prevented

[the police officer] from approaching [the defendant] simply to ask" him about what was going on in a suspicious home from which he had just exited) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions")).

Investigatory detentions, authorized by *Terry v. Ohio*, 392 U.S. 1 (1968), allow police to temporarily seize persons in order to investigate a "reasonable suspicion" that they are involved in criminal activity. This is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Nevertheless, "[r]easonable suspicion requires more than a hunch; it requires that the totality of the circumstances create, at least, some minimal level of objective justification for the belief that the [suspect] engaged in unlawful conduct." *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). Courts view that "totality . . . in the light of the officer's special training and experience because behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with [criminal] practices." *Matchett*, 802 F.3d at 1192 (quotes and cite omitted).

"The *Terry* rationale . . . permits police officers to stop a[n] . . . automobile based on a reasonable suspicion that its occupants are violating the law." *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989) (citing *United States v. Hensley*, 469 U.S. 221, 226 (1985)). And an officer's authority to effect a *Terry* stop carries with it the right to question an individual. *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984). Indeed, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972) (citing *Terry*, 392 U.S. at 21-22).

Officers Graff and Bibby had reasonable suspicion to investigate the car Moss slept in and temporarily detain and question its occupants. A man with an apparent financial interest in the vehicle reported it missing, then spoke to police in person when he found the vehicle parked on the street with two sleeping occupants, neither of whom he knew. *See United States v. Booker*, 579 F.3d 835, 839 (7th Cir. 2009) (reasonable suspicion to stop and question defendant existed where citizen approached police in person to report a crime and identified vehicle

defendant drove as the one the perpetrators were in). Bibby confirmed the man's interest in the car by examining financing paperwork and observing that the man possessed keys to the vehicle (common sense says that people with no interest in cars rarely have the keys and financing papers in their name, much less furnish both to police to prove their interest). Although such information "may have been insufficient for a[n] . . . arrest or search warrant," it "carried enough indicia of reliability to justify" Graff and Bibby investigating the occupants of the vehicle. *Adams*, 407 U.S. at 147 (1972); *see id.* (officer had reasonable suspicion to approach parked car and investigate occupant for possible gun and drug violations where known informant provided specific and immediately verifiable information).

Once they had reason to investigate the car and its occupants, Graff and Bibby had the right to "exercise unquestioned command of the situation" because of the great potential for danger associated with even a routine traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 703 (1981)). They suspected the car might be stolen, and it sat parked at a late hour on a public street with two unknown occupants asleep inside, neither of whom

owned the car. *Cf. Commonwealth v. Ferraro*, 66 Pa. D. & C. 2d 647, 653-54 (Pa. Com. Pl. 1974), *aff'd*, 352 A.2d 548 (Pa. Super. 1975) ("In view of the hour of the night and the serious nature of the stolen car charges, moreover, it was not unreasonable for [the police] to order defendant from the car to place him in a safer location where he might more readily be observed."). The danger quotient only increased after attempts to rouse the sleeping men failed, since unexpectedly awoken people may react unexpectedly, particularly those who steal vehicles and wake up to law enforcement attempting to question them.

That authority to control the situation included ordering Moss out of the car, the action at the center of his seizure claim. *See Mosley*, 743 F.3d at 1330 ("[W]hen officers have the requisite reasonable suspicion to justify a *Terry* stop of the occupants of a vehicle, and reason to believe those occupants may be armed and dangerous, the officers may reasonably order the occupants out of the vehicle as a means of neutralizing the potential danger without elevating the stop to the level of an arrest."). And once Graff lawfully seized Moss and the car, no constitutional impediment stood in the way of then seizing a weapon in plain view. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996)

(officers "patrolling a 'high drug area' of [a] city" had reasonable suspicion to stop "a dark Pathfinder truck with temporary license plates and youthful occupants waiting at a stop sign, [with] the driver looking down into the lap of the passenger at his right;" hence, "two large plastic bags of what appeared to be crack cocaine" visible in a passenger's hands through the truck's windows could thereafter be seized); *Michigan v. Long*, 463 U.S. 1032, 1050 (1983) (Fourth Amendment does not require the suppression of contraband found in plain view during a legitimate *Terry* stop); *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) ("The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.").

### III. CONCLUSION

Because his motion is untimely and in any event meritless, Terin Moss' motion to suppress (doc. 17) should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 21st day of July, 2016.

_____
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**